# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued March 18, 2005          Decided July 22, 2005

No. 04-1126

SECRETARY OF LABOR, MINE SAFETY AND HEALTH
ADMINISTRATION,
PETITIONER

v.

SPARTAN MINING COMPANY AND
FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION,
RESPONDENTS

———

On Petition for Review of an Order of the
Federal Mine Safety and Health Review Commission

———

*Jerald S. Feingold*, Attorney, Mine Safety & Health
Administration, argued the cause for petitioner. With him on the
briefs was *W. Christian Schumann*, Counsel.

*James S. Crockett, Jr.* argued the cause for respondent.
With him on the brief was *David J. Hardy*.

Before: EDWARDS, ROGERS, and GARLAND, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GARLAND.

GARLAND, *Circuit Judge*: This case concerns dueling interpretations of Department of Labor regulations that require coal mine operators to examine their mines for hazardous conditions before they send miners underground. Although in this case the outcome of the duel is not particularly close, it would not matter if it were. The standard of review that governs interpretive dueling before this court compels us to defer to the Secretary of Labor's interpretation of her own regulations unless it is plainly erroneous or inconsistent with the regulations. Because the Secretary's interpretation is neither, we grant her petition to vacate a Federal Mine Safety and Health Review Commission decision that adopted a conflicting construction.

I

Section 201 of the Federal Mine Safety and Health Act of 1977 (the "Mine Act") directs the Secretary of Labor to issue "improved mandatory health or safety standards for the protection of life and prevention of injuries in coal or other mines." 30 U.S.C. § 811(a). Acting through the Mine Safety and Health Administration (MSHA), *see* 29 U.S.C. § 557a, the Secretary has promulgated a wide array of such standards, which MSHA enforces by inspecting mines and issuing citations for violations, *see* 30 U.S.C. § 814(a). A mine operator can contest a citation before the Federal Mine Safety and Health Review Commission (FMSHRC), an adjudicative agency independent of the Department of Labor. *See id.* § 815(d). After a hearing, FMSHRC can affirm, modify, or vacate the citation. *See id.* Under the statutory scheme, however, the Commission is required to accord deference to "'the Secretary's interpretations of the law and regulations.'" *Secretary of Labor v. Cannelton Indus., Inc.*, 867 F.2d 1432, 1435 (D.C. Cir.1989) (quoting S. REP. NO. 95-181, at 49 (1977)); *see RAG Cumberland Res. LP v. FMSHRC*, 272 F.3d 590, 595 (D.C. Cir. 2001).

Cannelton Industries idled its Shadrick Mine on May 3, 2002. *Cannelton Indus., Inc. v. Secretary of Labor*, 24 FMSHRC 707, 707 (2002) ("*ALJ Decision*"). Because the company contemplated reactivating the mine at a later date, it needed to keep its electric pumps running to prevent the mine from flooding. The mine's electrical system, including a network of trolley wires that ran throughout the mine, was kept energized. On May 6, 2002, Cannelton began sending "pumpers" -- miners who maintain and repair pumps -- into the mine to work on the pumps. *Id.* at 708.

On May 15, 2002, a MSHA inspector issued Cannelton a citation for violating 30 C.F.R. § 75.360(a)(1), a mandatory safety standard that requires certified examiners to conduct a "preshift examination" before a mine operator may send miners underground. In particular, the citation charged that Cannelton had failed to have examiners inspect the energized trolley wires before the pumpers entered the mine. *See Secretary of Labor v. Cannelton Indus., Inc.*, 26 FMSHRC 146, 148 (2004) ("*FMSHRC Decision*"). The company contested the citation before a FMSHRC administrative law judge (ALJ), who vacated the citation on the ground that the "pumpers' exception" to the preshift examination requirement, 30 C.F.R. § 75.360(a)(2), rendered such an examination unnecessary. *See ALJ Decision*, 24 FMSHRC at 709-10. On the Secretary's petition for review, the Commission upheld the ALJ's determination. *See FMSHRC Decision*, 26 FMSHRC at 150-54. The Secretary then petitioned for review by this court.

In September 2004, Cannelton's parent company was the subject of a bankruptcy order, pursuant to which the parent of Spartan Mining Company purchased Cannelton's assets. *See* Pet'r Br. at 35-38. Spartan now owns the Shadrick mine. *See* Resp't Br. at 5. On January 12, 2005, we granted Spartan's unopposed motion to substitute itself for Cannelton as

4

respondent.[1]

## II

It is well-settled that this court must defer to the Secretary's interpretation of a MSHA standard as long as that interpretation is not "plainly erroneous or inconsistent with the regulation." *Akzo Nobel Salt, Inc. v. FMSHRC*, 212 F.3d 1301, 1303 (D.C. Cir. 2000) (quoting *Thomas Jefferson University v. Shalala*, 512 U.S. 504, 512 (1994)); *see Secretary of Labor v. Excel Mining, LLC*, 334 F.3d 1, 6 (D.C. Cir. 2003). It is equally well-settled that we owe the Secretary this deference even if FMSHRC interprets the standard differently. *See id.*; *Akzo Nobel Salt*, 212 F.3d at 1303; *Energy W. Mining Co. v. FMSHRC*, 40 F.3d 457, 462-63 (D.C. Cir. 1994); *Cannelton Indus.*, 867 F.2d at 1435.

The regulations at issue in this case are contained in subsections (a) and (b) of 30 C.F.R. § 75.360. The preshift examination requirement is set forth in paragraph (a)(1), which states:

> *Except as provided in paragraph (a)(2) of this section*, a certified person designated by the operator must make a preshift examination within 3 hours preceding the beginning of any 8-hour interval during which any person is scheduled to work or travel underground. No person other than certified examiners may enter or remain in any underground area unless a preshift

---

[1]We agree with the parties that Cannelton's inadvertent payment of the $259 fine imposed by the contested citation did not moot this case. As the Secretary observes, FMSHRC precedent indicates that if Spartan prevails in this proceeding, the company will be able to recover the money paid to the Secretary. *See, e.g.*, *Secretary of Labor v. Phelps Dodge Sierrita, Inc.*, 24 FMSHRC 661, 662 (2002).

> examination has been completed for the established 8-hour interval.

30 C.F.R. § 75.360(a)(1) (emphasis added). The substance of the required preshift examination is contained in subsection (b), which provides in relevant part:

> The person conducting the preshift examination shall examine for hazardous conditions . . . at the following locations:
>
> (1) Roadways, travelways and track haulageways where persons are scheduled . . . to work or travel during the oncoming shift.
>
> . . . .
>
> (3) Working sections and areas where mechanized mining equipment is being installed or removed, if anyone is scheduled to work on the section or in the area during the oncoming shift.
>
> . . . .
>
> (7) Areas where trolley wires or trolley feeder wires are to be or will remain energized during the oncoming shift.

*Id.* § 75.360(b). Finally, the pumpers' exception -- referenced by the phrase in paragraph (a)(1) italicized above -- is set forth in paragraph (a)(2):

> Preshift examinations of areas where pumpers are scheduled to work or travel shall not be required prior to the pumper entering the areas if the pumper is a certified person and the pumper conducts an examination for hazardous conditions . . . where the pumper works or travels. The examination of the area must be completed before the pumper performs any other work.

*Id.* § 75.360(a)(2).

The Secretary interprets these interconnected provisions as follows. Paragraph (a)(1) requires certified persons to conduct a preshift examination before anyone else may enter a mine. Subsection (b) describes the specific areas of the mine in which this examination must be conducted. These include certain areas, such as "roadways" and sections where "equipment is being installed," *id.* § 75.360(b)(1), (b)(3), that must be examined only if persons are scheduled to work or travel there. They also include other areas, such as those "where trolley wires or trolley feeder wires . . . remain energized," *id.* § 75.360(b)(7), that must be examined even if no one is scheduled to work or travel there. *Compare id.* (not containing a "scheduled to work" caveat), *with*, *e.g.*, *id.* § 75.360(b)(1), (3), (4), (5), (6) (all containing the caveat). Finally, the introductory clause of paragraph (a)(1) -- "[e]xcept as provided in paragraph (a)(2)" -- directs the reader to the sole exception to this preshift examination requirement. That exception, which permits pumpers to conduct their own examinations, applies only in "areas where pumpers are scheduled to work or travel." *Id.*

It is undisputed that Cannelton's pumpers properly conducted all required examinations of the areas where they worked or traveled, but that other areas went unexamined. In particular, no one examined areas where trolley wires remained energized, as subsection (b)(7) requires for preshift examinations. Spartan offers a series of reasons -- each of which FMSHRC accepted -- for reading § 75.360 to include the trolley wire areas within the pumpers' exception.

First, Spartan contends that the opening clause of paragraph (a)(1) -- "[e]xcept as provided in paragraph (a)(2)" -- means that the pumpers' exception is a complete exemption from the preshift examination requirement, and thus eliminates the

obligation to examine non-work areas like those where energized trolley wires are found. The plain language of paragraphs (a)(1) and (a)(2), however, gives the Secretary the better of this argument. The opening clause creates an exception only "as provided in" paragraph (a)(2), and that paragraph does not dispense with the preshift examination requirement altogether. To the contrary, it permits a pumpers' examination to substitute for a preshift examination only in "areas where pumpers are scheduled to work or travel." *Id.* § 75.360(a)(2). Because the preshift examination requirement otherwise remains applicable, energized trolley wires must be examined before pumpers may enter a mine. *See id.* § 75.360(b)(7).

Second, Spartan notes paragraph (a)(1)'s declaration that "[n]o person *other than certified examiners* may enter or remain in any underground area unless a preshift examination has been completed." *Id*. § 75.360(a)(1) (emphasis added). Reading this as permitting "certified examiners" to enter without a preshift examination, and further noting that the pumpers' exception applies only "if the pumper is a certified person," *id.* § 75.360(a)(2), Spartan concludes that no preshift examination is required before a (certified) pumper begins his or her work.

The Secretary disagrees. In her view, the quoted sentence -- which comes immediately after the sentence that imposes the preshift examination requirement -- merely means that a certified examiner may enter the mine before a preshift examination in order to conduct that examination. The quoted sentence thus serves an important purpose: it avoids the Catch-22 that would result if an examiner could not enter an area to conduct a preshift examination until an examiner had conducted such an examination. Spartan's reading of the sentence, by contrast, would render the pumpers' exception superfluous. If paragraph (a)(1) wholly exempted pumpers from the preshift examination requirement, there would be no need for the

pumpers' exception of paragraph (a)(2). The Secretary's contrary reading is thus perfectly reasonable.

Next, Spartan turns for support to the Federal Register preamble that accompanied the 1996 revision of § 75.360. "While this issue is not expressly resolved by the preamble or any other regulatory comments to the rule," Spartan contends, "the preamble contains numerous references that the pumpers' examination may be performed 'in lieu of,' rather than in addition to, a pre-shift examination." Resp't Br. at 14. Spartan's introductory disclaimer signals the uphill climb it faces in relying on the preamble, and the course indeed proves too steep. The preamble does state, as Spartan notes, that "*either* a preshift examination must be made in accordance with paragraph (a)(1) before a pumper enters an area, *or* certified pumpers must conduct an examination under paragraph (a)(2)." *Safety Standards for Underground Coal Mine Ventilation*, 61 Fed. Reg. 9765, 9792 (Mar. 11, 1996) ("*Safety Standards*") (emphases added). But the Secretary reasonably construes this alternative as applying only to the area the "pumper enters." Another sentence in the preamble confirms this construction: "Paragraph (a)(2) of the final rule provides that preshift examinations *of areas where pumpers are scheduled to work or travel* are not required . . . ." *Id.* (emphasis added). Similarly, although Spartan stresses the preamble's statement that "the pumper is conducting an examination in a limited area only for himself or herself," *id.*,[2] the Secretary reasonably explains that this language merely means that the pumpers' examination is a substitute for the preshift examination that would take place "in the limited area" in which the pumper "himself or herself" is

---

[2]*See also Safety Standards*, 61 Fed. Reg. at 9792 ("[T]he final rule provides an option for pumpers to perform examinations for themselves if they are certified."); *id.* ("The pumper may only perform an examination in lieu of a preshift for himself or herself.").

working. It is not a substitute for the broader examination otherwise required.[3]

Spartan also maintains that two subsections of the Mine Act, 30 U.S.C. § 863(d) and § 863(m), "when reviewed separately and together, clearly indicate that Congress did not intend to require a pre-shift examination of an idle mine outside the area where pumpers are working and traveling." Resp't Br. at 16. Although our own review reveals no such negative intent,[4] examination of those sections is beside the point.

---

[3]Spartan also notes the preamble's statement that "areas where persons are not scheduled to work or travel are not required to be examined under the final rule." *Safety Standards*, 61 Fed. Reg. at 9791. But as the Secretary points out, this statement was not a reference to the pumpers' exception, but rather a response to a specific comment suggesting that only a limited preshift examination be required when miners are "to work in the shaft, slope, drift, or . . . bottom area." *Id.* There is no indication that the statement was intended to contradict the text of § 75.360 -- which requires examination of "[a]reas where trolley wires or trolley feeder wires are to be or will remain energized," 30 C.F.R. § 75.360(b)(7), regardless of whether anyone is scheduled to work there.

[4]The language of subsection 863(d) is similar to that of 30 C.F.R. § 75.360 and does not undercut the Secretary's interpretation of the latter. *See* 30 U.S.C. § 863(d)(1) ("[B]efore any miner in [a] shift enters the active workings of a coal mine, certified persons designated by the operator of the mine shall examine such workings and any other underground area of the mine designated by the Secretary or his authorized representative."); *id.* § 863(d)(2) ("No person (other than certified persons designated under this subsection) shall enter any underground area, except during any shift, unless an examination of such area as prescribed in this subsection has been made within eight hours immediately preceding his entrance into such area."). The language of § 863(m) is similar to that of the preamble and is likewise reasonably subject to the Secretary's construction. *See id.* § 863(m)

Congress made quite clear that "[t]he provisions of sections 862 through 878 of this title shall be interim mandatory safety standards applicable to all underground coal mines until superseded in whole or in part by improved mandatory safety standards promulgated by the Secretary." 30 U.S.C. § 861(a). Whatever the import of those interim provisions, they have now been superseded by the Secretary's safety standards, including § 75.360.

Switching its attention from regulatory interpretation to policy, Spartan further contends that the Secretary's "interpretation is not entitled to deference because it diminishes, rather than promotes, safety." Resp't Br. at 10. That is so, Spartan insists, because sending pre-shift examiners "to conduct pre-shift examinations for areas far remote from those in which the pumpers will work and travel . . . will unnecessarily expose the preshift examiners to mine hazards, without measurably improving the health and safety of the pumpers." *Id.* at 20. The company is certainly correct that sending preshift examiners as well as pumpers into a mine exposes the examiners to hazards they would not experience if the pumpers went in alone. But the Secretary believes that the preshift examiners' risk is minimized by the fact that they, unlike the pumpers, are focused on a single task: detecting and correcting hazards. And on the other side of the ledger, the Secretary believes that sending in the examiners protects pumpers from serious hazards -- particularly the risk of fire triggered by energized trolley wires -- that can originate in areas other than those in which the pumpers are working and that are therefore beyond the scope of the pumpers' own examination. The Secretary's balancing of these safety risks and

---

(providing that "[p]ersons, such as pumpmen, who are required regularly to enter [idle and abandoned] areas in the performance of their duties . . . are authorized to make such examinations for themselves").

benefits is a reasonable policy judgment to which this court must defer. *See Excel Mining*, 334 F.3d at 11; *Energy W. Mining*, 40 F.3d at 463-64.

Finally, Spartan contends that, "even if the Secretary's interpretation was entitled to deference, the standard cannot be enforced in this instance because Cannelton did not have fair notice of the Secretary's interpretation" as required by the Due Process Clause. Resp't Br. at 10. Spartan's due process argument falls short of the mark. This is not a case in which the Secretary's "interpretation is so far from a reasonable person's understanding of the regulations that they could not have informed [Cannelton] of the agency's perspective." *General Elec. Co. v. EPA*, 53 F.3d 1324, 1330 (D.C. Cir. 1995). To the contrary, the regulation is "sufficiently clear to warn a party about what is expected of it." *Id.* at 1328; *see Trinity Broad. of Fla., Inc. v. FCC*, 211 F.3d 618, 628 (D.C. Cir. 2000).

## III

Because the Secretary of Labor's interpretation of 30 C.F.R. § 75.360 is reasonable, FMSHRC's contrary interpretation cannot stand. We therefore vacate the decision below and remand the case for further proceedings consistent with this opinion. The petition for review is

*Granted.*